UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KEVIN PARKER KLEE,

Plaintiff,

v.

NANCY A BERRYHILL,

Defendant.

Case No. 17-cv-00697-DMR

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 16, 22

Plaintiff Kevin Parker Klee moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found that Klee was not disabled and therefore denied his application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants Klee's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

## I. PROCEDURAL HISTORY

Klee is currently 51 years old. He worked as a manager of the free clothing program at Saint Anthony's for 18.5 years. Administrative Record ("AR") 42. He filed an application for Social Security Disability Insurance (SSDI) benefits on October 25, 2012, alleging disability due to bipolar disorder starting on October 14, 2011. AR 157-58, 168, 178. His application was initially denied on September 24, 2013 and again on reconsideration on December 31, 2013. AR 92-96 (Denial), 101-05 (Reconsideration). On January 23, 2014, Klee filed a request for a hearing before an Administrative Law Judge (ALJ). AR 107. ALJ John Heyer held a hearing on April 1, 2015 during which Klee appeared and testified, along with vocational expert (VE) David Van Winkle. AR 38-58.

On June 4, 2015, ALJ Heyer issued a decision finding that Klee was not disabled. AR 21-

33. He determined that Klee had the following severe impairment: bipolar affective disorder (20 C.F.R. § 404.1520(c)). AR 26. He also found that Klee: 1) was 44 years old on the alleged date of disability and thus was a younger individual; 2) had at least a high school education and was able to communicate in English; 3) had engaged in substantial gainful activity[1] since October 14, 2011, the alleged disability onset date; but 4) was unable to perform any past relevant work. AR 26, 31-32.

ALJ Heyer concluded that Klee retained the following residual functional capacity (RFC): Klee could lift 20 pounds; sit, stand, and walk for 6 hours each in a 8-hour day; was limited to simple repetitive tasks; was unable to work with the general public; and was able to work in proximity to others but not as part of a team. AR 27.

He also concluded that there were jobs that Klee could perform with such a RFC. AR 32. In so concluding, ALJ Heyer relied on the opinion of the VE, who testified that an individual with such a RFC could perform other jobs existing in significant numbers in the national economy, including mail clerk, office helper, and packager/inspector. AR 32.

On August 16, 2016, the Appeals Council denied Klee's request for review. AR 12-17. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin*., 659 F.3d 1228, 1231 (9th Cir. 2011). Klee then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III. FACTUAL BACKGROUND

Klee has a history of suicide ideation, depression, and bipolar disorder. He was hospitalized twice for suicidal ideation, once in 2001 and then in 2014. The following is a chronological discussion of the relevant mental health medical evidence.

A.      **Relevant Medical Evidence**

1.      **2001 Admission for Suicidal Ideation**

On September 10, 2001, Klee admitted himself to the California Pacific Medical Center ("CPMC") Emergency Room complaining of increased depression and suicidal ideation. AR 251. Upon admission, he indicated that he had been feeling increased depression for the past 3 months. *Id*. He also complained of insomnia, increased appetite, anhedonia, anxiety, and feelings of hopelessness. *Id*. Regarding suicidal ideation, Klee made superficial cuts on his wrists that day, and had thoughts of riding his motorcycle on 101 and not making the turn. *Id*. He had no prior history of suicide attempts, and stated that he was feeling manic for approximately 3 months prior. *Id*. His outpatient psychiatrist was Dr. William Anderson, whom he started seeing on August 13, 2001 for depression. AR 252. Upon a mental status examination, Klee presented as a well-dressed and well-groomed male with fair eye contact, normal speech rate, a depressed and anxious mood, an appropriate affect, and linear thought process. AR 253. Aside from suicidal ideation, his insight and judgment were otherwise good. *Id*. His DSM-IV diagnoses were: Axis I[2]: Major

---

[2] "There are five axes in the DSM diagnostic system, each relating to a different aspect of a mental disorder:

Axis I: This is the top-level diagnosis that usually represents the acute symptoms that need treatment; Axis I diagnoses are the most familiar and widely recognized (e.g., major depressive episode, schizophrenic episode, panic attack). Axis I terms are classified according to V-codes by the medical industry (primarily for billing and insurance purposes).

Axis II: This is the assessment of personality disorders and intellectual disabilities. These disorders are usually life-long problems that first arise in childhood.

Axis III: This is the listing of medical and neurological conditions that may influence a psychiatric problem. For example, diabetes might cause extreme fatigue, which may lead to a depressive episode.

Axis IV: This section identifies recent psychosocial stressors—the death of a loved one, divorce, loss of a job, etc.—that may affect the diagnosis, treatment, and prognosis of mental disorders.

Axis V: This section identifies the patient's level of function on a scale of 0–100, where 100 is the highest level of functioning. Known as the Global Assessment of Functioning ("GAF") Scale, it attempts to quantify a patient's ability to function in daily life."

*Cantu v. Colvin*, No. 5:13-CV-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM–IV") at 27-34. The court cites to the DSM-IV because it was in place at the time of the relevant medical records were created. It has been replaced by the DSM-5, which eliminated the multiaxial system of diagnosis.

Depressive Disorder; Axis II; Deferred; Axis III: Graves Disease; Axis IV: Unknown; and Axis

VI: GAF[3] score of 35.[4]  AR 254.

Klee was discharged from CPMC on September 12, 2001.  AR 248.  Upon discharge, he

was given a prescription for Serzone, which previously had yielded good results.  *Id.*  Upon a

mental status examination, Klee denied any suicidal ideation and had goal-directed and linear

thought processes.  AR 249.  His DSM-IV diagnoses were: Axis I: Bipolar Disorder Type II; Axis

II; Deferred; Axis III: Graves Disease, Hypothyroidism; Axis IV: Problems Related to the Primary

Support Group; and Axis VI: GAF score of 70.[5]  *Id.*

## 2.  Treating Psychiatrist William A. Anderson, M.D. (February 2013)

Klee saw Dr. Anderson irregularly from June 22, 2010 through February 7, 2013.  AR 324.

Although there are records indicating that Klee started seeing Dr. Anderson as early as August

2001, *see* AR 252, there are no treatment records from Anderson other than the February 7, 2013

Mental Disorder Questionnaire Form.  AR 320-24.

On February 7, 2013, Anderson completed a Mental Disorder Questionnaire Form.  AR

320-24.  In the Questionnaire, he described Klee's general appearance as variable depending on

his mood, depressed or manic.  AR 320.  When Klee was in a depressed mood, he presented as

moody, despondent, suicidal, negative, hypersensitive, and almost paranoid.  *Id.*  When he was in

---

[3] "GAF" stands for Global Assessment of Functioning and assessed as part of Axis V of the DSM.
It is a scale ranging from zero to 100 that is used to rate "psychological, social, and occupational
functioning on a hypothetical continuum of mental-health illness."  DSM–IV at 32.  The Ninth
Circuit has noted that while "GAF scores, standing alone, do not control determinations of
whether a person's mental impairments rise to the level of a disability (or interact with physical
impairments to create a disability), they may be a useful measurement."  *Garrison v. Colvin*, 759
F.3d 995, 1003 (9th Cir. 2014).

[4] A GAF score of 31 to 40 indicates "some impairment in reality testing or communication (e.g.,
speech is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as
work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends,
neglects family, and is unable to work; child frequently beats up younger children, is defiant at
home, and is failing at school).  DSM–IV at 34.

[5] A GAF score of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild
insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional
truancy, or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships."  DSM-IV at 34.

United States District Court
Northern District of California

a hypermanic mood, he presented as exuberant, almost euphoric, excessively chatty, hyperactive, and subject to questionable judgment. AR 320; 322 (Klee's "reality thinking and judgment do become compromised when he is living toward the manic end of the mood spectrum, at which he becomes grandiose and unrealistic"). Anderson indicated that Klee had a lifelong history of severe mood swings, which were predominantly depressive in childhood, but were often characterized by manic outbursts in recent years, "one of which led to his current unemployability." AR 320. Regarding Klee's current level of functioning, Anderson observed that Klee could care for himself satisfactorily; had a number of friends which varied with his moods; and was able to maintain his household, but had poor concentration when depressed and had distractibility due to attention deficit hyperactivity disorder (ADHD). AR 322-23. He also observed that in recent years Klee's "mood instability [had] made employability problematic, if not impossible." AR 323. Anderson diagnosed Klee with bipolar disorder, ADHD, and panic disorder, and noted that his prognosis was guarded and depended on "social support . . . and employability . . . ." AR 324.

### 3. Consulting Examining Psychologist Faith Tobias, Ph.D. (April 2013)

On April 22, 2013, Klee saw Dr. Tobias for a psychological disability evaluation. AR 325-28. He presented with ADHD, diagnosed 6 years ago; bipolar disorder; and manic or hypomanic symptoms, but denied any current suicidal ideation, plan or intent. AR 325. He reported that he had received counseling most of his adult life and recently discontinued counseling due to the lack of insurance. AR 326. Regarding the activities of daily living, Klee indicated that he was generally able to perform all activities of daily living (with restrictions related to his psychiatric symptoms and decreased grip strength), such as washing and dressing himself; preparing simple meals; doing light household chores and light shopping; and taking public transportation and driving. *Id.* His usual activities included socializing with family, attending religious activities, attending doctor's appointments, watching TV, listening to music, taking naps, and using the computer. *Id.*

Upon a mental status examination, Tobias observed, among other findings, that Klee was appropriately dressed in casual clothing with adequate hygiene; oriented to person, place, and

time; restricted in affect; mildly to moderately depressed and anxious in mood; and had linear and coherent thought process. AR 326. He denied suicidal or homicidal ideation or auditory or visual hallucinations. *Id.*

Upon behavioral testing, Klee demonstrated normal psychomotor testing, visual scanning, and sequencing, and mental flexibility. AR 327. He also showed average ability in perceptual reasoning; working memory; processing speed; verbal memory; visual memory; the ability to recall verbal and visual information immediately; and the ability to recall verbal and visual information after 20-30 minutes; and a higher than average ability in verbal comprehension. *Id.*

Tobias diagnosed Klee with Axis I: Bipolar II Disorder and History of Attention-Deficit/Hyperactivity Disorder (per claimant); Axis II: Diagnosis Deferred; Axis III: Diagnosis Deferred to Medical Opinion; Axis IV: Problems associated with primary support group, employment, finances, and health; and Axis V: GAF score of 60.[6] AR 328. He noted that Klee's presentation of psychiatric symptoms appeared to be genuine and valid; the obtained test results appeared to be valid (not the result of decreased effort) and that Klee currently appeared to be experiencing mild to moderate symptoms of depression. *Id.*

Based on his examination and the test results, Tobias opined that Klee had no impairment in his ability to follow/remember simple instructions; follow/remember complex/detailed instructions; maintain adequate pace or persistence to perform one to two step simple repetitive tasks; maintain adequate attention/concentration; and adapt to changes in a job routine. AR 328. He also opined that Klee had mild to moderate impairment in his ability to withstand the stress of a routine work day and maintain emotional stability/predictability; and none to mild impairment in his ability to interact appropriately with co-workers, supervisors, and the public on a regular basis. *Id.*

//

//

---

[6] A GAF score of 51 to 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

#### 4. Non-Examining State Agency Medical Consultants

##### a. Andres Kerns, Ph.D. (May 2013)

Dr. Kerns conducted a review of Klee's medical records and completed a mental residual functional capacity assessment on May 24, 2013. AR 59-72. Kerns found that Klee was able to maintain adequate attention and concentration for simple routines and to sustain a workday/workweek schedule. AR 71. He also found that Klee was able to accept instructions and constructive criticism from a supervisor, and was able to interact, on a limited basis, with the public and coworkers. AR 71. He further noted that Klee was able to adapt to simple changes, and avoid obvious hazards, and travel. AR 72. Based on his review of the medical records, Kerns opined that Klee was able to meet the basic mental and emotional demands of unskilled work including the abilities to understand, carry out, and remember simple instructions; make simple work-related decisions; respond appropriately to supervisors, co-workers, and work situations; and deal with routine changes in a work setting. AR 72. He also opined that Kerns would do best in work settings requiring minimal social interaction. *Id*.

##### b. R. Tashjian, M.D. (December 2013)

Dr. Tashjian also conducted a medical records review and completed a mental residual functional capacity assessment on December 30, 2013. AR 82-87. Tashjian affirmed Kern's assessment. AR 86-87.

#### 5. Treating Psychologist Robert Sardy, Ph.D. (December 2013 - March 2014)

Klee saw Dr. Sardy from December 17, 2013 through April 15, 2014 for weekly to biweekly visits. AR 539-47. At the initial December 17, 2013 visit, Klee reported a history of bipolar disorder with no description of a manic episode, and that he last took the medications for bipolar disorder in 2008-2009. AR 542. He indicated that he was currently experiencing difficulty concentrating, fatigue, hopelessness, irritability, worry, obsessive thoughts, decreased self-esteem, and depression. AR 542. Sardy observed, among other findings, that Klee had linear thought processes and content; a stressed mood with a calm affect; and he denied suicidal and homicidal ideation. *Id*.

On December 24, 2013, Klee continued to report symptoms of depression, but denied

suicidal ideation. AR 542. Sardy noted the same objective findings as made on the prior visit, and continued to assess Klee as bipolar. *Id*.

The following week, on December 31, 2013, Klee reported that he was "OK" but had a continued concern about depression and irritability. AR 543. Sardy noted the same objective findings as made on prior visits. *Id*. He assessed Klee as bipolar and indicated that the plan was to explore cognitive structures that support depression. *Id*. He completed a service reauthorization form on this day, requesting that Klee be seen 1-2 times per week for a total of 18 sessions starting January 7, 2014 and ending on April 30, 2014. AR 539-41.

Klee did not show up for the January 7, 2014 appointment because he was hospitalized on January 6, 2014 for suicidal ideation. AR 543.

Sardy then saw Klee on January 14, 2014 following his hospitalization. *Id*. At this visit, Klee reported that he was frustrated with ongoing stressors (financial demands and decreased income due to discontinued disability), and noted that his depression was 5 out of 10 due to stress. *Id*. He also reported that he was hospitalized on January 6, 2014 due to suicidal ideation; according to Klee, "things got too much for me." *Id*. He denied suicidal ideation, but stated that he was still depressed and stressed by his current situation. *Id*. Sardy discussed a plan for suicidal ideation/self-care; noted the same objective findings as made on prior visits and continued to assess Klee as bipolar. *Id*.

On January 21, 2014, Klee reported irritability, mood swings, and that his depression was 4 out of 10. AR 544. Sardy noted many of the same objective findings as made on prior visits, with the exception that Klee reported some suicidal ideation thought content "at times." *Id*. He continued to assess Klee as bipolar and educated him on monitoring himself for irritability. *Id*.

On February 4, 2014, Klee reported feelings of irritability, that he found himself getting angry with people, and discussed concerns about ongoing financial issues. AR 544. Sardy noted the same objective findings as made on prior visits and made the same assessment (bipolar). *Id*. He discussed with Klee how to monitor his mood and identify when he was irritable. *Id*.

Two weeks later, on February 18, 2014, Klee described his mood as "depressed" and indicated that he was concerned about his landlord's cancer diagnosis and the fact that the house

United States District Court
Northern District of California

he was living in would be sold. AR 544. Sardy noted many of the same objective findings as on prior visits with the exception that Klee presented with a depressed mood and congruent affect. *Id*. He continued to assess Klee as bipolar. *Id*. A week later, on February 25, 2014, Klee continued to discuss his concern about his landlord and rated his depression as 7 out of 10, but denied suicidal ideation. *Id*. Sardy noted the same objective findings as made on the February 18, 2014 visit and the same assessment (bipolar). *Id*.

On March 4 and 11, 2014, Klee reported feeling irritable and the presence of multiple stressors in his life including the fact that his aunt was dying. *Id*. He rated his depression as 5 out of 10 on March 11, 2014. *Id*. Sardy noted many of the same objective findings as made on prior visits with the exception that Klee presented with an irritable mood and with speech that was more rapid than normal. *Id*. He continued to assess Klee as bipolar. *Id*.

Klee's next appointment with Sardy was on March 25, 2014. AR 546. At that visit, Klee reported that he had been having mood swings and cognitive process problems (forgetting things). *Id*. He indicated a continued ability to pay bills, cook, and clean, but was concerned about his memory. *Id*. He also reported that he started Seroquel 3 days ago, and did not feel stable, but denied suicidal or homicidal ideation. *Id*. Sardy noted the same objective findings as made on prior visits with the exception that Klee presented with a depressed mood and congruent affect and with speech that was more rapid than normal. *Id*. He continued to assess Klee as bipolar, and noted that he reported "cognitive process problems" and feelings of instability, but that these descriptions were vague. AR 546.

Klee's last reported visit with Sardy was on April 15, 2014. *Id*. At this visit, he noted that he had troubles with a visit from his parents, and a depressed and irritable mood. *Id*. Sardy noted the same objective findings as made on prior visits with the exception that Klee reported a depressed and irritable mood and presented with speech that was more rapid than normal. *Id*. He continued to assess Klee as bipolar. *Id*.

### 6. 2014 Admission for Suicidal Ideation

On January 6, 2014, Klee's sister and his friend admitted him for suicidal ideation because he planned to pour gasoline over himself and set himself on fire in front of the Social Security

10

Administration building. AR 360. He reported that he had been disabled since October 2011, recently received a second denial letter on his Social Security claim, and had been feeling angry and suicidal since then. *Id*. He indicated that he was sleeping more than usual, had low energy, limited attention, decreased appetite with an approximately 5 pound weight loss over several weeks, and was very irritable and agitated. *Id*. Upon a mental status examination, Klee presented as alert and irritable in appearance/behavior; irritable and angry in affect; angry in mood; with poor insight and judgment; and with suicidal ideation. AR 361. He was diagnosed as Axis I: Depression NOS; Axis II: Diagnosis Deferred on Axis II (799.9), consider Bipolar Disorder); Axis III: None acute; Axis IV: problems relate to the Social Security disability and financial stress; and Axis V: GAF score of 20.[7] Klee was placed on 5150 DTS (danger to self) hold and admitted to the inpatient psychiatry unit. AR 362.

He was interviewed the next morning on January 7, 2014. In the interview, he stated that his suicidal ideation was "more an indicator of his frustration and anger regarding financial challenges and improvement life circumstances and denied genuine imminent suicidal intent." AR 348. During his admission, he received group therapy, pharmacotherapy, individual psychotherapy, milieu therapy, and occupational therapy. AR 347.

Klee was discharged on January 8, 2014. AR 347. Upon discharge, he was "low acute risk," denied suicidal ideation, and was future oriented. *Id*. Upon a mental status examination, Klee presented as appropriate and having good eye contact in appearance/behavior; normal speech; appropriate and non-labile in affect; with a "depressed, but better" mood; with a coherent and goal-directed thought form; with no evidence of abnormality in thought content; with no suicidal ideation, plan or intent; with fair insight and judgment; and fully oriented. AR 348. He was diagnosed as Axis I: Depressive Disorder NOS (311); Axis II: Borderline traits; Axis III: Hypothyroidism, sore throat; Axis IV: social isolation, unemployed; and Axis V: GAF score of

_____

[7] A GAF score of 11 to 20 indicates "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute)." DSM–IV at 34.

45.[8]  At the time of discharge, he had an appointment with clinician Meredith Reddoch at Mission Mental Health, and a follow-up appointment with his primary care physician, Dr. Martin Mass. AR 349.

### 7.    Treating Psychiatrist Israel Katz, M.D. (January 2014 - March 2015)

Klee saw Dr. Katz from February 12, 2014 through March 23, 2015 almost monthly for bipolar depression.  AR 524-37.

On January 15, 2014, Klee presented to the Mission Mental Health Team post hospitalization for suicidal ideation.  AR 519.  Therapist Meredith Reddoch-Ho completed an assessment of this visit.  At the January 15, 2015 visit, Klee reported suicidal ideation and feeling more depressed, and noted that his agitation was increasingly worse than it usually was.  *Id.*  He described his periods of mania with increased energy, sleepless, agitated, talkative, feeling gifted (grandiose), and being revved up.  *Id.*  He also reported that he had not been on medications or seen a psychiatrist since February 2013 and that he was "not compliant with [his] medications and forgot to take them."  *Id.*  Upon a mental status examination, Klee presented as cooperative and open; well-groomed, having good hygiene, and stylishly dressed; responsive to cues; with some restricted affect but congruent with mood; with some depression but pleasant mood; with linear thought process and no disorder; with fair insight and judgment; with an intact memory; fully oriented; and with suicidal ideation in the past, but not upon intake; with no homicidal ideation; and fair intelligence.  AR 520.  He indicated that he was living on retirement income and was stressed about his financial situation.  AR 521.  He stated that he stopped working as a manager at Saint Anthony's due to his bipolar disorder.  Reddoch-Ho described Klee's strengths as having friendships, being social with others, and seeming resourceful.  *Id.*  Klee reported that his sister was a "significant support" to him.  *Id.*  Reddoch-Ho diagnosed Klee with Axis I: Affective Psychoses Bipolar Affective Disorder Depressed Severe Without Mention of Psychotic Behavior; Axis II: Other Unknown and Unspecified Cause of Morbidity and Mortality; Unknown Diagnosis;

---

[8] A GAF score of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 34.

1    and Axis IV: Occupation and Economic.  AR 522.  She noted that Klee would continue to see

2    therapist Sardy and that he would be a "medications only client."  AR 521.

3         On February 12, 2014, Klee saw Katz for an initial psychiatric evaluation.  AR 524. His

4    chief complaint was: "I need help for my cyclical mood swings."  *Id*.  Katz obtained a full mental

5    health history from Klee.  *Id*.  He observed that Klee had a history of major depression since

6    adolescence and had at least 6 episodes of mania or hypomania.  *Id*.  He noted that Klee denied all

7    suicidal ideation and plans since his 2014 hospitalization, as well as manic and psychotic

8    symptoms.  *Id*.   Klee reported a depressed mood, initial insomnia, anhedonia, difficulty

9    concentrating, low self-esteem, and tiredness.  AR 524.  He indicated that he felt too depressed to

10   go back to work, and also reported a history of "non-adherence to medication."  *Id*.  According to

11   Klee, he took his medications, felt better, and then stopped taking his medications.  *Id*.  He stated

12   that he was coming to terms with the need for long-term medication, and noted that he had been

13   on Lamictal in the past, and re-started it 2 weeks ago.  *Id*.  Regarding his work history, Klee stated

14   that he worked for Saint Anthony's for 18.5 years before he was told to quit or resign.  AR 525.

15        Upon a mental status examination, Klee presented as appropriately groomed and

16   cooperative; with a normal rate of speech; with a depressed mood and affect; with tangential

17   thought processes; and fair insight and judgment.  *Id*.

18        Katz diagnosed Klee with bipolar disorder, most recent episode depressed, moderate

19   without psychotic features, among other non-mental health conditions.  *Id*.  In his

20   recommendations, he noted that Klee had a history of non-adherence to medication and that Klee

21   would investigate this issue in therapy.  *Id*.  Because Klee expressed a willingness to continue on

22   Lamictal, which had been the most helpful medication, Katz increased the dosage of the Lamictal

23   prescription.  *Id*.

24        At the March 17, 2014 visit, Klee reported an adherence to Lamictal and denied a rash or

25   any other side effects.  AR 527.  He also reported a depressed mood, anhedonia, tiredness, and

26   occasional thoughts of suicide approximately twice a week with the thought that he might be

27   better off dead.  *Id*.  He denied any plans for suicide or owning any weapons or plans to plan any.

28   *Id*.  Upon a mental status examination, Klee presented as appropriately groomed; with a depressed

13

1    mood and affect, denied any suicidal ideation, plan or intent; and fully oriented.  AR 527.  Katz

2    diagnosed Klee with bipolar disorder.  He noted that Klee did not want to increase the Lamictal

3    dosage for now, and agreed to try Seroquel to address his insomnia and understood that this

4    medication might also help his bipolar depression, but usually at a higher dosage.  *Id*.

5         Klee saw Katz on April 28, 2014 for a follow-up appointment.  AR 528.  At this visit, Klee

6    reported that he had a nightmare the first night he took Seroquel, and had been having nightmares

7    for the past 2 nights.  *Id*.  He stated that he found out that he would lose his housing 2 days ago.

8    *Id*.  He also indicated that he had been stressed, anxious, depressed, irritable, and experiencing

9    some dry mouth and weight gain.  *Id*.  He denied any plans to kill himself, although he reported

10   that he had thoughts that he might be better off dead from time to time, but that these thoughts did

11   not last very long.  *Id*.  Upon a mental status examination, Klee presented as appropriately

12   groomed; with a depressed mood and affect; with goal-directed thought processes; and denied

13   suicidal ideation or plan.  *Id*.  Katz indicated that he discussed Seroquel with Klee and noted that

14   Klee agreed that the nightmares were more likely related to stress of losing his housing rather than

15   Seroquel.  *Id*.  Katz continued Klee on Lamictal and increased the Seroquel dosage, depending on

16   Klee's tolerance.  *Id*.  His diagnosis was the same as that made on prior visits.  *Id*.

17        Katz saw Klee for another follow-up appointment on May 12, 2014.  AR 529.  At this visit,

18   Klee reported adherence to his medications and denied any side effects.  *Id*.  Klee indicated that he

19   felt a bit less depressed with less frequent suicidal ideation, which happened several times a week

20   and included images of him jumping in front of traffic or from a bridge.  *Id*.  He denied attempting

21   suicide or any plans for suicide and identified his sister, nephew, and parents as some of his

22   reasons to continue living.  *Id*.  Katz noted that Klee was losing his housing next week and was

23   moving into his sister's basement in San Francisco.  *Id*.  Upon a mental status examination, Klee

24   presented as appropriately groomed; with depressed mood and affect; with goal-directed thought

25   processes; and denied suicidal ideation or plan.  *Id*.  Katz increased the Seroquel dosage given

26   Klee's ongoing depression and continued him on Lamictal.  *Id*.  His diagnosis was the same as that

27   made on prior visits.

28        On May 21, 2014, Katz saw Reddoch-Ho for a therapy session and case management due

United States District Court
Northern District of California

to increased life stressors.  AR 530.  At this session, Klee reported feeling very stressed because he had to move out of his apartment where he had lived for many years.  *Id*.  Reddoch-Ho noted that Klee was "down on himself" and felt like "things just [kept] getting increasingly worse for him."  *Id*.  She indicated that she provided Klee with support, validation, encouragement, and information on the Tenants Rights Union where he could get some free legal advice about his housing.  *Id*.  Klee was appreciative, responsive in the session, and reported that he would look into some of the case management tasks they discussed.  *Id*.

At the June 9, 2014 visit, Klee reported that he was taking his medication every day and denied any side effects including rash, sedation, or weight changes.  AR 531.  He also reported that the medication (Seroquel) was helping him feel less depressed and that he had much less suicidal ideation, and presently thought about suicide twice a week, which took the form of images of him jumping in front of a car.  *Id*.  He denied any plans to harm himself and stated that he had good relationships with several family members and wanted a better future.  *Id*.  He indicated that his housing situation was a bit better and that he was going to get some money from landlord upon moving out and would then move in with his sister.  *Id*.  Upon a mental status examination, Klee presented as appropriately groomed; with a dysphoric mood and affect; with goal-directed thought processes; and denied suicidal ideation or plan.  *Id*.  His diagnosis was the same as that made on prior visits.  *Id*.  Katz continued Klee on his current medications (Lamictal and Seroquel).  *Id*.

On June 11, 2014, Katz completed a Mental Functional Assessment.  AR 344-45.  He diagnosed Klee with Bipolar I Disorder, most recently with depression, moderate without psychotic features.  AR 344.  He observed that Klee presented with daily depressed mood, anhedonia, difficulty concentrating, low self-esteem, and tiredness.  *Id*.  Katz rated Klee as moderately impaired (an impairment that affected, but did not preclude the ability to function) in the activities of daily living and social functioning.  *Id*.  However, he rated him as markedly impaired in concentration, persistence, and pace, noting "difficulty concentrating and depressed," and in the ability to adapt to work type of settings, noting "anxious, with depressed mood."  AR 344-45.  He opined that Klee had suffered these levels of impairment for the past 4 months at least, and indicated that his prognosis for Klee was "guarded."  AR 345.

On July 21, 2014, Katz saw Klee for another follow-up session. AR 532. At this visit, Klee stated that he was taking his medication every day and that he thought that the medication had helped him. However, he also indicated that he was still experiencing a depressed mood with moderate intensity most of the week, along with anhedonia, tiredness, and anger that he still had to move out of his house. *Id*. He reported that he had brief episodes of suicidal ideation where he thought that he might be better off dead, but denied any intention of killing himself and indicated that his wish to get better kept him alive. *Id*. Upon mental status examination, Klee presented as appropriately groomed, with some psychomotor retardation, and a depressed mood and affect. He denied suicidal ideation or plan and was fully oriented. *Id*. Katz continued him on Seroquel and prescribed him an increased dosage of Lamictal upon Klee's agreement. *Id*. His diagnosis was the same as that made on prior visits. *Id*.

Katz saw Klee for a follow-up appointment for mood symptoms on October 27, 2014. AR 533. At this visit, Klee reported that he had been taking medication and that he thought that the Lamotrigine (Lamictal) had helped him feel less depressed. *Id*. He also reported ongoing depression that had lessened to a mild-moderate degree with some anhedonia and tiredness, but that he was overall more energetic and hopeful. *Id*. He stated that he now had thoughts of suicide about once per week for a few hours, namely that he might be better off dead, but did not have a specific plan to kill himself. *Id*. Katz indicated that Klee had moved in with his sister, and the transition had been challenging. *Id*. Upon a mental status examination, Klee presented as appropriately groomed, with a dysphoric mood and affect and goal-directed thought processes; denied suicidal ideation or plan, and was fully oriented. *Id*. Katz diagnosed Klee with bipolar disorder I, currently depressed, mild to moderate without psychotic features. *Id*. Katz increased Klee's Lamictal dosage, continued the Seroquel dosage, and noted that he (Klee) was aware of possible rash and other side effects. *Id*.

Klee saw Katz on December 17, 2014 for a follow-up appointment on mood symptoms. AR 534. At this visit, Klee stated that he was taking his medications daily, denied a rash, but stated that he had been feeling groggy/sedated. *Id*. He also indicated that he had been irritable and depressed, and angry about his life and health issues. *Id*. However, he reported that he had

16

1    less frequent suicidal ideation; had infrequent thoughts that he might be better off dead

2    approximately once per week for a few minutes; and had no plans to harm himself or others.  AR

3    534.  Upon mental status examination, Klee presented as appropriately groomed and fully oriented

4    and denied suicidal ideation or plan.  AR 534.  Katz diagnosed him with bipolar I disorder,

5    currently depressed.  *Id*.  Katz decreased the Lamictal dosage and continued him on the current

6    dosage of Seroquel.  *Id*.  Klee indicated that he did not want to increase the dosage of Seroquel or

7    try other medications at this time.  AR 534.

8        On January 26, 2015, Katz saw Klee for a follow-up visit on mood symptoms.  AR 535.

9    At this visit, he stated that he was taking his medications daily and reported dry mouth when he

10   took Seroquel and wanted to stop taking it.  *Id*.  He indicated that his mood had been OK and that

11   he had not had suicidal ideation or plan.  *Id*.  Katz noted that Klee still felt depressed, but not most

12   of the time.  *Id*.  Upon a mental status examination, Klee presented as well-groomed, with a

13   dysphoric mood and affect, and goal-oriented thought processes and denied suicidal ideation or

14   plan.  *Id*.  Katz continued him on Lamictal and decreased the dosage of Seroquel and advised him

15   to discontinue use if he noticed no change in his mood symptoms.  *Id*.  His diagnosis was the same

16   as that made on prior visits.  *Id*.

17       Klee saw Katz for a follow-up visit on bipolar depression approximately a month later on

18   February 25, 2015.  AR 536.  At this visit, Klee indicated that he had gotten off Seroquel and did

19   not have any withdrawal symptoms and that he was continuing to take Lamictal.  *Id*.  He noted

20   that he had been depressed and had an episode of suicidal thinking approximately 1-2 weeks ago,

21   but did not harm himself.  *Id*.  He thought that it might be better off to be dead, but denied any

22   plans for suicide.  *Id*.  Klee reported a depressed mood, anhedonia, tiredness, and was interested in

23   trying Latuda.  *Id*.  Upon a mental status examination, Klee presented as appropriately groomed,

24   with some psychomotor retardation and a depressed mood and affect.  *Id*.  However, he denied

25   suicidal ideation or plan.  *Id*.  Katz continued Klee on Lamictal and started him Latuda.  His

26   diagnosis was the same as that made on the prior visits.  *Id*.

27       On March 23, 2015, Klee saw Katz for another follow-up visit on bipolar depression.  AR

28   537.  At this visit, Klee reported adherence to his medications and indicated that he had nausea

after taking Latuda and vomited twice while initially taking it.  AR 537.  He stated that the nausea had been slowly decreasing, but that he still experienced it.  *Id*.  He indicated that he continued to feel depressed, although a little so, and thought that the Latuda helped him feel less depressed.  *Id*.  Klee also reported that he had not had any suicidal ideation since the last appointment on February 23, 2015.  *Id*.  Upon a mental status examination, Klee presented as appropriately groomed, with some psychomotor retardation and a depressed mood and affect, and goal-directed thought processes.  *Id*.  He denied suicidal ideation or plan.  *Id*.  Katz continued Klee on Latuda and Lamictal.  *Id*.

There are no other progress notes in the record after March 23, 2015.

**B.      Klee's Testimony**

At the hearing, Klee testified to the following: Klee was born on November 19, 1966 and was 48 years old as of the date of the hearing.  AR 42.  He has a driver's license and drives occasionally.  *Id*.  He was evicted from his house and now lives with his sister and her family, who take care of him.  AR 45.

Klee last worked in November 2011 as a manager of the free clothing program at Saint Anthony's, a job which he had for 18.5 years.  AR 42.  He stopped working at Saint Anthony's because he was forced to resign or be terminated.  AR 43.  He was not performing well at his job at Saint Anthony's during his last couple of years, i.e., paperwork aspects of his job, and the appraisals.  AR 43.  His friend, who was the assistant manager at that time, handled most of his responsibilities.  *Id*.  After he left Saint Anthony's, Klee started to look for work, and gather materials to apply for jobs, but did not follow through because of his disability.  AR 44.  He claims disability on the basis of bipolar disorder, and does not claim disability based on any physical limitations.  AR 44.

In a typical day, Klee watches TV, feeds his cat, and tries to go for a walk outside.  AR 45.  Sometimes, there are days where he cannot get out of bed.  *Id*.  When he can, he tries to help out his sister and brother-in-law, who are both teachers.  *Id*.  For example, he tries to clean up after dinner, vacuums, sweeps, mops, and do the laundry.  *Id*.  Klee tries to keep a very regular schedule, otherwise he will start to go manic or slide into depression.  *Id*.

Regarding bipolar disorder, Klee testified that he had been seeing a psychiatrist at Mission Mental Health and also went to a bipolar support group weekly, as well as other support groups, which helped him. AR 46. He also takes mental health medications, e.g., Lamictal/Lamotrigine. AR 46, 48. These medications have a lot of side effects including stomach aches and feeling dim. AR 46, 48. The medications, however, have prevented him from becoming too manic or too depressed, or from having full blown mental health episodes. AR 46, 48. However, he wishes that the medications worked better since he is still a little manic or depressed even after he takes them. AR 48. He also takes medications for non-mental health condition such as Graves disease (thyroid), high cholesterol, back pain, hernia, and an enlarged prostate. AR 47.

Regarding his medication compliance, the ALJ pointed to various medical records noting Klee's non-compliance with his medications. AR 48, 49; *see also* AR 519 (1/15/14 Mission Mental Health Team Adult/Older Adult Assessment (Short Report) ("[S]ince February 2013 having no medications or psychiatry. Clt. reports he is not compliant with medications and forget[s]t to take them."); 524 (2/12/14 Mission Mental Health Team Progress Notes) ("He reports hx non-adherence to medication. He takes meds, feels better, then stops medication."). Klee admitted that, in the past, he used to take his medications, stop because he felt good and then have a full blown manic episode, but that this had not happened since. AR 49.

The ALJ also referenced records stating that Klee's bipolar disorder was controlled with medications. AR 50; *see also* AR 499 (11/13/14 Progress Note from Dr. Jonathan Hongsupp Lee) ("Bipolar Disorder: currently controlled with medications (Seroquel and Lamictal) and continues to see Psychiatrist at Mission Neighborhood. States mood is 'pretty good' after moving in with his sister."); 336 (7/11/13 Progress Note from Physician's Assistant Martin Kramer) ("Bipolar - stable). Klee confirmed that the referenced records were from his primary doctors, not his mental health doctors. AR 50. He noted that he felt better when he consistently took his medications, but that he did not have many days where he was in the middle (not too depressed or manic). *Id*.

In response to questions from his attorney, Klee testified that he had more depressive than manic symptoms. AR 51. His depression started when he was a teenager. *Id*. Over the years, he tried many anti-depressants, and medications, without any real relief. *Id*. Even though he held

down a job for a number of years, he spent many days in the office with his door closed because he could not even face people. AR 51. During the last 2-3 years of his job at Saint Anthony's, his depression worsened and he had suicidal thoughts. AR 52. During his manic phases, he feels really good, but also very agitated and irritated and a result, yells at people. *Id*. When he is in his manic phases, he sometimes does not take his medications, which he realizes he must do for the rest of his life. AR 53. Last January 2014, he had a major meltdown when he received a denial letter from the Social Security Administration that resulted in a 5150 hold. *Id*. At that time, he had run out of money. *Id*. He received treatment at the hospital including medication adjustment and counseling. *Id*. Regarding household chores (laundry, cleaning, and cooking), Klee indicated that he was able to perform household chores 7-10 days month, but that there were 6-7 days a month where he was unable to do so. AR 54. As a result of his bipolar disorder, Klee has lost close friends and housemates. *Id*. He gets along "okay" with his sister and brother-in-law, but feels like he is a burden/extra-expense. AR 54.

### C. VE Testimony

At the hearing, the VE categorized Klee's past work history as follows: department manager, DOT code 299.137.010 with a medium extertional level and a SVP[9] of 7. AR 55.

The ALJ posed a hypothetical to the VE to determine what jobs an individual with Klee's restrictions could perform. He noted that Klee did not base his disability claim on physical limitations and posed the following hypothetical: an individual of Klee's age and education with the past jobs the VE described; who is limited to performing work at a light exertional level; who can lift up to 20 pounds; who can sit, stand, and walk each 6 hours in a 8-hour day, and can

---

[9] "'SVP' refers to the 'specific vocational preparation' level which is defined in the DOT as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230, n.4 (9th Cir. 2009) (quoting *Dictionary of Occupational Titles*, Appendix C, p.1009 (4th ed. 1991)). "'The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 C.F.R. 404.1568 and 416.968, unskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT.'" *Bray*, 554 F.3d at 1230, n.4 (quoting *Policy Interpretation Ruling: Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P (S.S.A. Dec. 4, 2000)).

complete a 8-hour work day with some combination of sitting, standing, and walking; who is limited to simple, repetitive tasks; who cannot have contact with the public; and who is able to work in proximity to others, but not as part of a team.  AR 55-56.  The VE testified that an individual with such restrictions would be unable to perform Klee's past work.  AR 56.  However, the VE testified that an individual with these restrictions would be able to perform three jobs in the national economy: 1) mail clerk, DOT code 209.687-026, light exertional level, unskilled work, and a SVP of 2; 2) office helper, DOT code 239.567-010, light exertional level, and unskilled work; and 3) packer/inspector, DOT code 559.587-074, light exertional level and unskilled work. AR 56-57.  Regarding the office helper job, the VE testified that although there were approximately 70,000 jobs nationally, he eroded that number by 50 percent to 35,000 to take into account Klee's limitation that he could work in proximity to others, but not as part of a team since clerical work could be performed in a team in some circumstances.  AR 56.

Klee's attorney then posed a second hypothetical to the VE.  Klee's attorney asked the VE to assume all the elements of the ALJ's hypothetical with the following addition: the individual would miss 3 days of work per month due to symptoms from his bipolar disorder, i.e., an impaired ability to sustain an ordinary routine without supervision and to tolerate the usual stress of competitive employment.  AR 57.  The VE testified that an individual with these restrictions would be unable to perform any of the jobs he had identified earlier.  AR 57.

## IV.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a mere scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not

21

affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. ISSUES PRESENTED

Klee contends that the ALJ erred by 1) giving less weight to the opinions of treating psychiatrists, Dr. Katz and Dr. Anderson; 2) discrediting the medical evidence by selectively relying on medical records that showed improvement; and 3) rejecting his credibility. He requests an award of benefits or, in the alternative, remand for a determination of benefits.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## VI. DISCUSSION

### A. The ALJ's Evaluation of the Medical Evidence

Klee argues that the ALJ erred in failing to give clear and convincing reasons for assigning less weight to the opinions of treating psychiatrists, Dr. Katz and Dr. Anderson.

#### 1. Legal Standards

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id.*

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's opinion, while entitled to more weight, is not necessarily conclusive. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion. *Lester*, 81 F.3d at 830. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989). This same standard applies to the rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa*, 143 F.3d at 1244. An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

//

//

23

### 2. Analysis

#### a. Katz

Katz saw Klee for bipolar depression and related symptoms at least once a month from February 12, 2014 through March 23, 2015. AR 524-37. During this time, he adjusted the dosage of Klee's medications, mainly Lamictal and Seroquel, as well as prescribed new medications (Latuda) in order to manage and lessen his symptoms. On June 11, 2014, Katz completed a mental functional assessment in which he diagnosed Klee with Bipolar I Disorder, most recently with depression, moderate without psychotic features. AR 344. He opined that Klee was moderately impaired (an impairment that affected, but did not preclude the ability to function) in the activities of daily living and social functioning, but that he was markedly impaired (an impairment that seriously interfered with the ability to function) in concentration, persistence, and pace, noting "difficulty concentrating and depressed," and in the ability to adapt to work type of settings, noting "anxious, with depressed mood." AR 344-45. Katz indicated that Klee suffered these levels of impairment for the past 4 months at least and that his prognosis was "guarded." AR 345.

The ALJ assigned little weight to Katz's June 2014 opinion, finding that it was "too restricted and not consistent with medical records, which document[ed] improvement with medication." AR 31.

Klee contends that the ALJ's reasons for assigning little weight to Katz's 2014 opinion were conclusory, insufficient, and neither legitimate nor specific. He argues that the ALJ failed to explain why he believed Katz's assessment was too restrictive, and points to the fact that the ALJ did not cite to any specific medical records or identify any specific conflicts or inconsistencies in the record in support of his conclusion. Klee also asserts that the ALJ's finding that the medical records documented his improvement with medication is equally unsupported because (1) the medical records relied on are part of the ALJ's discussion of Klee's credibility, and are not part of the ALJ's reasoning regarding Katz's opinion; and (2) the medical records were from his primary care physician at Sutter, not Katz, or even Sandy, his therapist. Klee also argues that the ALJ failed to take into account that Katz saw him every month or other month since February 2014 up

24

to the hearing date and knew him well.

Since Katz's opinion is contradicted by those of consulting examining psychologist Tobias, who opined that Klee was not impaired in his ability to maintain adequate attention/concentration and to adapt to change in a job routine, *see* AR 328, and non-examining state agent consultants Kerns and Tashjian, who opined that Klee was able to deal with routine changes in a work setting and maintain adequate attention and concentration for simple routine tasks and sustain a workday/workweek schedule, *see* AR 71-72, 86-87, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount Katz's opinions. *See Lester*, 81 F.3d at 830.

Having reviewed the entire record, the court finds that the ALJ failed to provide specific and legitimate reasons for assigning little weight to Katz's June 2014 opinion. The ALJ's discussion of Katz's opinion was terse and cryptic. Katz was Klee's treating psychiatrist. He saw Klee regularly from February 2014 to March 2015 and consistently documented that Klee continued to experience suicidal ideation and depression-related symptoms even when he was compliant with his medications. *See, e.g.*, AR 529 (5/12/14 visit) (reporting medication compliance, but also suicidal ideation that occurred several times a week); 532 (7/21/14 visit) (reporting medication compliance, but also a depressed mood with moderate intensity most of the week, and brief episodes of suicidal ideation); 533 (10/27/14 visit) (reporting medication compliance, but also ongoing depression, and thoughts of suicide about once per week for a few hours); 534 (12/17/14 visit) (reporting medication compliance, but also depression, irritability, and thoughts of suicide once week for a few minutes); 535 (1/26/15 visit) (reporting medication compliance, but also a depressed mood); 536 (2/25/15 visit) (reporting medication compliance, but also depression and an episode of suicidal thinking approximately 1-2 weeks ago); 537 (3/23/15 visit) (reporting medication compliance, but also continuing to feel depressed). These findings are consistent with Katz's June 2014 opinion in which he observed that Klee had marked impairment in concentration, persistence, and pace and in the ability to adapt to work type of settings, as well as Anderson's February 2013 assessment. AR 344-45 (Katz); *see also* AR 322-23 (Anderson) (noting that Klee had poor concentration when depressed and distractibility due to ADHD). Given

the paucity of the reasoning provided by the ALJ, the court cannot conclude that the ALJ correctly weighed Katz's opinion. As previously discussed, in order to discount the opinion of a treating physician who is contradicted by another medical source, an ALJ must "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted). "[B]road and vague" reasons do not suffice. *McAllister*, 888 F.2d at 602. The ALJ's terse statement regarding his decision to give little weight to Dr. Katz's opinion does not meet this standard.

To the extent the ALJ relied on medical records to discredit Katz's opinion, the ALJ did little to engage with the record as a whole and explain his reasoning. For example, the ALJ apparently discounted Katz by relying on the isolated statements of a non-mental health provider from a single November 13, 2014 visit to Sutter characterizing Klee's bipolar depression as stable and controlled with medications. AR 30 (citing Ex. 13F: 14, 16, 20). Similarly, the ALJ's decision to give Katz's opinion little weight because the records show that Klee's symptoms improved with medication is fairly conclusory. Katz documented Klee's improvement when he was compliant with his medications, but also observed that Klee's suicidal ideation and depression did not abate with medication compliance. For example, on December 17, 2014, a little over a month after his November 13, 2014 visit to Sutter relied upon by the ALJ, Klee reported that he was taking his medications regularly, but still had suicidal thoughts approximately once per week. AR 533. He continued to report feeling depressed on January 26, 2015 with medication compliance. AR 535. On February 25, 2015, Klee reported that he was continuing to take Lamictal, was still depressed, and had an episode of suicidal thinking approximately 1-2 weeks prior. AR 536. He also reported feeling depressed on March 23, 2015, his last visit with Katz, with medication compliance, but denied suicidal ideation for the past month. AR 537.

As the Ninth Circuit has explained, "[c]ycles of improvement and debilitating symptoms are a common occurrence [with mental health issues], and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir.

2001)); *Holohan*, 246 F.3d at 1205 ("[The treating psychiatrist] statements must be read in context of the overall diagnostic picture he draws. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."); *Ghanim v. Colvin*, 763 F.3d 1154, 1161-62 (9th Cir. 2014) (ALJ erred in rejecting the opinions of treating physicians based on treatment notes showing "some improved mood and energy level;" the treatment notes must read in the "'context of the overall diagnostic picture'" and "consistently reflect[ed] that [the plaintiff] continued to experience severe symptoms, including ongoing depression and auditory hallucinations, difficulty sleeping, nightmares, and memory loss") (quoting *Holohan*, 246 F.3d at 1205).

Here, the record as a whole demonstrates that Klee has had a history of chronic and persistent bipolar depression dating back to 2001, marked by two hospitalizations for suicidal ideation, the most recent occurring in 2014. The consultative examiner opined that Klee's presentation of psychiatric symptoms appear to be genuine and valid. Even during a recent period of improvement with medication compliance, his treating physician opined that he could not work. The recent period of improvement shows a gradual abatement of suicidal ideation and depression, but not necessarily an increase in work functionality or employability. The ALJ did not provide enough evidence or reasoning to discount a significant amount of treatment records and conclude that Klee can "function effectively in a workplace" based on his improved symptoms. *See Garrison*, 759 F.3d at 1017 (explaining that reports of improvement in the context of mental health issues must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace."); *see also Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011) (citations omitted) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce, and that difference is borne out in [the] treatment notes. Those notes show that although [plaintiff] had improved with treatment, she nevertheless continued to frequently experience bouts of crying and feelings of paranoia. The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits.").

In conclusion, the ALJ erred in assigning little weight to Katz's June 2014 opinion.

### b. Anderson

Anderson completed a Mental Disorder Questionnaire Form on February 7, 2013, which is the only document from Anderson in the record. AR 320-24. The record indicates that Anderson first treated Klee as an outpatient psychiatrist in August 2001. AR 252. In the 2013 Questionnaire, Anderson indicates that he saw Klee irregularly from June 22, 2010 through February 7, 2013. AR 324. He described Klee as variable depending on where he was in a depressed or manic mood. AR 320. In a depressed mood, Klee presented as moody, despondent, suicidal, negative, hypersensitive and almost paranoid. *Id.* In a hypermanic mood, he presented as the opposite, i.e., exuberant, almost euphoric, excessively chatty, hyperactive, and subject to questionable judgment. *Id.*; AR 322. Anderson indicated that Klee had a lifelong history of severe mood swings, which were predominantly depressive in childhood, but were often characterized by manic outbursts in recent years, "one of which led to his current unemployeability." AR 322. He observed that Klee could care for himself satisfactorily; had a number of friends which varied with his moods; and was able to maintain his household, but had poor concentration when depressed and distractibility due to attention deficit hyperactivity disorder (ADHD). AR 322-23. He also observed that in recent years Klee's "mood instability [had] made employability problematic, if not impossible." AR 323. He diagnosed Klee with Bipolar disorder, ADHD, and panic disorder, and indicated that his prognosis was guarded and depended on "social support . . . and employability . . . ." AR 324.

The ALJ assigned little weight to Anderson's February 2013 opinion because it was "not supported by the medical evidence" and Klee "had infrequent visits" with Anderson. AR 31.

Klee contends that the ALJ's reasons for assigning little weight to Anderson's February 2013 opinion were conclusory, insufficient, and neither legitimate nor specific. He argues that the ALJ erred in failing to cite to specific medical records and evidence to support his conclusion.

Since Anderson's February 2013 opinion is contradicted by those of consulting examining psychologist Tobias, who opined that Klee was not impaired in his ability to maintain adequate attention/concentration and to adapt to change in a job routine, *see* AR 328, and non-examining state agent consultants Kerns and Tashjian, who generally opined that Klee's mental impairment

28

did not render him unemployable, *see* AR 71-72, 86-87, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount Anderson's opinions. *See Lester*, 81 F.3d at 830.

Having reviewed the entire record, the court finds that the ALJ failed to provide specific and legitimate reasons for assigning little weight to Anderson's February 2013 opinion. Like his discussion of Katz's opinion, the ALJ's discussion of Anderson's opinion is terse and conclusory. While the ALJ correctly noted that Anderson saw Klee infrequently, Anderson still treated Klee over 3 year period and thus had an opportunity to observe his progression or regression. Additionally, contrary to the ALJ's finding, Anderson's opinion is supported by the medical evidence. Specifically, it is consistent with Katz's June 2014 opinion in which he observed that Klee had marked impairment in concentration, persistence, and pace and in the ability to adapt to work type of settings. AR 344-45 (Katz). It is also consistent with the overall medical record which shows that Klee had a history of chronic mental health issues (bipolar depression) and continued to experience suicidal ideation and depression with medication compliance. *See, e.g.*, AR 529 (5/12/14 visit); 532 (7/21/14 visit); 533 (10/27/14 visit); 534 (12/17/14 visit); 535 (1/26/15 visit); 537 (3/23/15 visit).

In conclusion, the ALJ erred in assigning little weight to Anderson's February 2013 opinions.

### 3.    Selective Medical Record Review

Klee contends the ALJ erred in rejecting the opinions of treating psychiatrists such as Katz and Anderson by selectively relying on records showing improvement and ignoring others showing continued, severe impairment. He argues that the record is replete with treatment notes showing that his symptoms persisted and remained severe, despite medication compliance and some improvement. This argument is duplicative of those raised in the prior section discussing the ALJ's evaluation of the medical evidence. For the reasons discussed above, the court finds that the ALJ erred in evaluating the medical evidence, and, in particular, assigning little weight to Katz's and Anderson's opinions.

//

1

### B. The ALJ's Evaluation of Klee's Credibility

2      Klee argues that the ALJ erred in assessing his credibility. He contends that the ALJ did

3  not provide clear and convincing reasons for rejecting his testimony. Since critical parts of these

4  issues are tied to the ALJ's evaluation of the medical evidence, about which the court has already

5  found error, the court refrains from analyzing the ALJ's credibility finding at this time. Under

6  these circumstances, it makes sense on remand for the ALJ to reevaluate the credibility

7  determination upon reevaluation of the medical evidence.

8  ## VII.  CONCLUSION

9      In conclusion, the court grants Klee's motion, denies the Commissioner's cross-motion,

10 and remands this case for further proceedings.

11

12      **IT IS SO ORDERED.**

13 Dated: August 17, 2018



IT IS SO ORDERED

Donna M. Ryu
United States Magistrate Judge
Judge Donna M. Ryu

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28